1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

**SAN JOSE DIVISION**

10

11      UNITED STATES OF AMERICA,                 Case No.  15-cr-00506-BLF-1

            Plaintiff,

12

13      v.                                        **ORDER DENYING MOTION TO
                                                   DISMISS AND MOTION TO SUPPRESS**

14      CLINTON EDWARD ATKINS,

            Defendant.

15

16

17              Defendant, Clinton Edward Atkins ("Atkins"), has been charged in a two count indictment

18      with violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition

19      ("Count 1"), and section 922(a)(1)(A), Unlicensed Manufacturer of Firearms ("Count 2").  Atkins

20      moves to dismiss Count 1 on the basis that he was not prohibited from possessing firearms at the

21      time that he allegedly committed his charged crimes.  Mot. to Dismiss Indictment Set 3 ("Mot.")

22      2, 9, ECF 32.  Atkins also moves to suppress the evidence obtained in support of the indictment

23      based on violation of his constitutional rights.  *Id.* at 2.  The Court held an evidentiary hearing on

24      the motion to suppress, and considered the arguments of the parties, and the parties' latest set of

25      briefing along with all of Atkins' declarations received to date.  For the reasons discussed below,

26      the motion to dismiss and the motion to suppress are DENIED.

27      **I.      PROCEDURAL HISTORY**

28              Atkins has been charged in a two count indictment with violation of 18 U.S.C. section

922(g)(1), Felon in Possession of a Firearm and Ammunition ("Count 1"), and section 922(a)(1)(A), Unlicensed Manufacturer of Firearms ("Count 2"). ECF 1. Atkins has previously submitted several rounds of briefing in connection with this motion to dismiss the indictment along with self-attested declarations. ECF 15, 19, 28. Each time this Court held a hearing after a round of briefing, Atkins requested an opportunity to submit additional briefing. ECF 22, 26, 31. During the hearing on February 28, 2017, Atkins requested for the first time in open court an evidentiary hearing on a motion to suppress. ECF 35. Atkins also represented to the Court that the briefing submitted on January 27, 2017 should be the only set of briefing this Court should consider on this motion and that the Court need not consider the briefing submitted prior to January 27, 2017. May 10, 2017 Hr'g Tr. ("Tr.") 122:11-20. On May 10, 2017, this Court held an evidentiary hearing on Atkins' suppression motion. ECF 39. At the hearing, the Government introduced testimony from Agent Kim, and also moved into evidence without objection the "Report of Investigation," drafted by Agent Kim as Exhibit 1, and photos taken inside Atkins' garage as Exhibits 2 and 3. Atkins also testified during the evidentiary hearing and moved into evidence without objection a portion of his cell phone log, as Defendant's Exhibit 10. Atkins also requested the Court to take into considerations all the declarations he had submitted in the prior rounds of briefing, which the Court granted.

## II.    FACTUAL BACKGROUND

The criminal charges against Atkins arise from an investigation conducted by Tae-Kyun Kim and Oluwatoba Awolola, special agents of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"). May 10, 2017 Hr'g Tr. ("Tr.") 15:7-14.

### A.    Agent Kim's Testimony

The following evidence is taken from Agent Kim's testimony. The agents learned from a concerned citizen that Atkins was involved in the business of manufacturing AR-15 type firearms from incomplete receivers, commonly referred to as "80 percent" receivers, and that Atkins hosted multiple "80 percent" receiver build parties at his residence, among other information. *Id.* at 11:17-12:4. After some background investigation, the agents learned that Atkins had been

convicted of a felony under California Vehicle Code section 2800.2, that he and his associates were involved in an online business called "80 receivers," the name of which was later changed to "MajorOddball.com," and that he was also actively involved in a gun enthusiast forum called "Calguns.net." *Id.* at 12:8-23.

On July 15, 2014, the agents decided to visit Atkins at his residence and arrived there at 1:30 p.m. *Id.* at 15:7-18; 44:13-15. Upon arrival, the agents identified themselves and showed their credential identifying themselves as ATF agents. *Id.* at 44:16-21. The agents told Atkins the reason for their visit while they stood at the front door. *Id.* at 46:1-3. After that, Atkins led the agents inside his house to his dining table. *Id.* at 45:16-19. The agents conducted an interview with him in his kitchen/dining area and recorded part of the interview session. *Id.* at 17:13-18; 19:1-2; 33:1-11.

At one point during the visit, Atkins asked the agents whether he was under arrest, to which the agents responded that Atkins was not under arrest and he was not in custody. *Id.* at 20:2-13. According to Agent Kim, he and Agent Awolola thus had no reason to read Atkins the Miranda rights given that Atkins was not under arrest. *Id.* at 60:17-25. Agent Kim also testified that Atkins was free to leave his residence, free to talk to his wife and child, and free to take a break. *Id.* at 61:20-62:2. In fact, at another point during the visit, Atkins went outside to his front yard for a "smoke break." *Id.* at 20:8-24; 21:21-23. While on his smoke break in his front yard, Atkins also asked the agents if he could call his attorney and the agents said he was free to do so. *Id.* at 21:3-20. Based on the phone log, Atkins made a first phone call in an attempt to reach his attorney at 2:18 p.m. *Id.* at 51:22-52:10; Ex. 10. And he also made phone calls at 2:23 p.m. and at 2:24 p.m. *Id.* at 53:24-54:10. Atkins was unable to make contact with his attorney and came back inside the residence after his smoke break. *Id.* at 24:3-16; 69:11-14. During the interview, Atkins never told the agents that he did not want to talk without an attorney. *Id.* at 58:16-59:2; 59:14-60:4. Atkins also never asked the agents to cease questioning. *Id.* at 69:5-10.

After Atkins came back from his smoke break, the agents inquired about the location of his firearms. *Id.* at 24:24-25:15. Atkins then opened up the gun safe and showed the agents the firearms and the ammunitions. *Id.* at 26:6-11. The agents next told Atkins that he could not

possess these firearms because of his prior felony conviction. *Id.* at 26:12-15. Atkins responded that he wanted to relinquish the firearm to his uncle. *Id.* at 26:16-18. The agents then said that they would need his uncle's contact information to ensure that the uncle was not barred from possessing firearms. *Id.* at 26:19-27:24. The agents also alternatively proposed to Atkins that he could voluntarily abandon the firearm to ATF. *Id.* at 27:6-13. Atkins did not provide any contact information on his uncle and instead, "willingly chose" the agents' second option to voluntarily surrender the firearms to ATF, and signed the form to that end. *Id.* at 26:23-24; 27:14-17. The agents also looked in his garage for indicia of firearms manufacturing and took photos with Atkins' permission. *Id.* at 19: 18-22; 28:21-29:4. According to Agent Kim, the interview session lasted about 60 minutes. *Id.* at 44:8-12. Agent Kim testified that the agents left Atkins' residence before 3:00 p.m. *Id.* at 55:3-6. According to the phone log, Atkins made another phone call at 3:08 p.m. *Id.* at 53:24-54:3.

**B. Atkins' Testimony**

The following evidence is taken from Atkins' testimony. According to Atkins, the agents arrived at his house around 1:50 p.m. or 2 p.m., and not at 1:30 p.m. as Agent Kim testified. *Id.* at 101:13-102:17; 112:12-23; 115:15-116:4. The two agents were both wearing ATF-issued equipment which showed "ATF." *Id.* at 103:1-6. After Atkins invited the agents into his house, he led the agents to his kitchen table. *Id.* at 75:10-12; 75:16-19; 103:1-24. Atkins admitted that the agents did not threaten him and "were professional the whole time." *Id.* at 104:14-18. During the entire duration of the visit, Atkins' wife and two children were home, the television was on, and Atkins was not restrained. *Id.* at 104:22-105:8.

The agents did not tell him the reason for their visit until after they were in the kitchen. *Id.* at 103:22-24. About five minutes after the agents and Atkins sat down at the dining table and seven minutes after one of the agents said that he thinks "[Atkins] did something illegal," Atkins made his first phone call. *Id.* at 82:6-10. At one point during the interview, Atkins told the agents that they "need[ed] to stop [the interview]" and that he wanted to "speak to a lawyer." *Id.* at 82:25-83:7. Atkins then placed another phone call at the table in front of one of the agents. *Id.* at 83:5-7. However, when Atkins could not reach the attorney, the agent told him not to worry,

stating "nothing you say here will get you charged, as long as you don't lie to me." *Id.* at 83:5-7. The agent also stated that as long as he did not lie, no charges would be filed and that he would "be in no trouble." *Id.* at 89:12-17. Atkins also asked the agent a few times during the interview whether he was under arrest, to which the agent responded no. *Id.* at 105:10-106:11.

The agents allowed Atkins to make phone calls on multiple occasions during the interview. *Id.* at 107:6-13. After failing to reach his attorney, Atkins again requested the interview to be postponed until he could speak with a lawyer. *Id.* at 85:2-7. The agents denied his request and kept asking him questions. *Id.* at 85:2-7; 91:4-13. The agent told him that the interview would not be postponed and that the agents would not leave the house unless they knew there was no firearm present. *Id.* at 85:15-17; 88:19-89:2. The agent also told Atkins that he "didn't need a lawyer every time [he] tried to call." *Id.* at 85:18-20. Atkins testified that these phone calls were made about 10 or 15 minutes after the interview started. *Id.* at 86:3-11. Atkins further testified that he did not feel free to leave. *Id.* at 85:8-14; 113:18-114:6.

At one point during the interview, Atkins and the agents took a break but Atkins denied that the break was initiated by him. *Id.* at 106:12-107:5. According to Atkins, when Agent Kim walked out to talk on the phone with his boss, Atkins followed him out onto the front lawn and smoked a cigarette. *Id.* at 106:12-22.

Atkins eventually agreed to relinquish his firearms to the agents. *Id.* at 90:4-12. He signed the paperwork and brought the firearms to the agents. *Id.* at 92:3-18. He even helped the agents "carry out the ammo [to their car] because their hands were full." *Id.* at 92:19-24.

According to Atkins, the interview lasted for about an hour or an hour and fifteen minutes and ended around 3:10 p.m. or 3:15 p.m. *Id.* at 87:3-7; 116:1-3. The last phone call Atkins made at 3:08 p.m. was when the agent was still present and "talking to his boss" over the phone. *Id.* at 87:8-13.

## C. Agent Kim's Rebuttal Testimony

The following evidence is taken from Agent Kim's rebuttal testimony. Agent Kim denied ever telling Atkins that he would not leave unless he was sure that there were no guns on the premises. *Id.* at 117:24-118:10. Agent Kim also testified that he did not tell Atkins that he would

5

come back with a warrant if the firearms were not surrendered. *Id.* at 118:11-16. In addition, Atkins never told the agents that he did not want to talk without an attorney present. *Id.* at 118:17-28.

### III. ATKINS WAS PROHIBITED FROM POSSESSING FIREARMS WHEN HE ALLEGEDLY COMMITTED THE CHARGED CRIMES

The indictment charges Atkins with violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm, based on a prior state court felony conviction under California Vehicle Code § 2800.2. Atkins argues that he only had a misdemeanor, which cannot sustain an 18 U.S.C. § 922(g) charge. Specifically, he avers that pursuant to his plea to a state court conviction, he only received "formal probation" and later "270 days in county jail," for violating probation, which qualified the conviction as "a misdemeanor for all purposes . . . after a judgment imposing a punishment other than imprisonment in the state prison." Mot. 11-12 (citing to Cal. Penal Code § 17(b)(1)). Atkins further contends that firearm prohibitions were not automatically imposed for most misdemeanor convictions in California, but could be imposed as a condition of misdemeanor probation. Mot. 14. Given that the state court did not "check the box" on the minute order to impose this condition, Atkins contends that the minute order reflects his plea deal whereby he was not prohibited from owning firearms. *Id.* at 15.

The government counters that Atkins was a convicted felon on July 15, 2014, the date he allegedly possessed the firearms and ammunitions at issue in Count I. Second Supp. Opp'n ("Opp'n"), ECF 33. The government also argues that California law automatically prohibits a person with a felony conviction, such as Atkins, from owning or possessing firearms. *Id.* at 8-9. Lastly, the government contends that the state court's failure to "check the box" prohibiting firearm ownership had no impact on the restriction on Atkins' right to own or possess firearms. *Id.* at 9.

18 U.S.C. § 922(g)(1) provides:

> It shall be unlawful for any person—[] who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year [] to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any

firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The predicate felony for Atkins' 18 U.S.C. § 922(g)(1) charge is his guilty plea to violating California Vehicle Code § 2800.2 in 1998.  Mot. 9; Exs. 1 and 2 to Opp'n.  Atkins does not dispute that he pled guilty to this felony violation in November 1998.  The relevant portion of California Vehicle Code § 2800.2 provides:

> If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, or by confinement in the county jail for not less than six months nor more than one year.

Cal. Veh. Code § 2800.2(a).  In California, a felony offense, such as a violation of California Vehicle Code § 2800.2, is "punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(g)(1); *see* Cal. Penal Code § 18 ("Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a felony, or to be punishable by imprisonment in a state prison, is punishable by imprisonment in any of the state prisons for 16 months, or two or three years").

Nonetheless, a violation of Vehicle Code § 2800.2(a) is characterized as a "wobbler," and may be punished, as either a misdemeanor or a felony.  California Penal Code § 17 permits the conviction to be "wobbled" down to a misdemeanor in accordance with the following:

> (a) A felony is a crime that is punishable with death, by imprisonment in the state prison, or notwithstanding any other provision of law, by imprisonment in a county jail under the provisions of subdivision (h) of Section 1170.  Every other crime or public offense is a misdemeanor except those offenses that are classified as infractions.

> (b) When a crime is punishable, in the discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances:

> (1) After a judgment imposing a punishment other than imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170. . . .

The Court finds that contrary to Atkins' contentions in reliance of § 17(b)(1), his conviction was not a misdemeanor for all purposes.  California Penal Code § 17 indeed provides

that "a judgment imposing a punishment other than imprisonment in the state prison" automatically converts a felony wobbler to a misdemeanor. However, if the court "suspends the pronouncement of judgment or imposition of sentence and grants probation, the offense is regarded [as] a felony for all purposes until judgment or sentence[.]" *People v. Esparza*, 253 Cal. App. 2d 362, 364-65 (1967). If a judgment is never pronounced, a conviction "remains a felony." *Id*. at 365; *see also United States v. Diaz-Argueta*, 564 F.3d 1047, 1049 (9th Cir. 2009); *United States v. Qualls*, 172 F.3d 1136, 1137 (9th Cir. 1999) (en banc). That is because "[a]n order granting probation is not a judgment." *People v. Smith*, 195 Cal.App.2d 735, 737 (1961); *see also United States v. Robinson*, 967 F.2d 287, 293 (9th Cir. 1992), *abrogated in part on other grounds as recognized in Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1020 (9th Cir. 2006).

*People v. Banks* is instructive here. 53 Cal. 2d 370, 376 (1959). The defendant in *Banks* pled guilty to vehicle theft, a wobbler. *Id*. at 376. The state trial court suspended imposition of sentence and granted the defendant three years' probation, conditioned upon 12 months in county jail, which the defendant successfully completed. *Id*. at 377. In an appeal of a subsequent conviction for being a felon in possession of a firearm, the defendant argued that his conviction should be set aside because he had never suffered a predicate felony conviction. *Id*. at 380-81. Specifically, the defendant claimed that because he was sentenced to probation, his conviction became a misdemeanor under California Penal Code § 17. *Id*. at 375. The California Supreme Court rejected the defendant's argument, reasoning that a grant of probation was not an entry of judgment but was a means for the trial court to retain jurisdiction for the possibility to increase the sentence should defendant "prove himself a recidivist." *Id*. at 387-89. As a result, the defendant remained a convicted felon for purposes of the felon-in-possession statute "until and unless" the prior crime was reduced to a misdemeanor by the court's issuance of a misdemeanor sentence. *Id*. at 388.

Here, when Atkins was sentenced on December 22, 1998, the trial court classified the offense as a felony, as reflected on the docket sheet, and imposed two years of probation and a nine-month jail term, but the "imposition of sentence [was] suspended for the probation period." Ex. 1 to Opp'n, ECF 33-1. Eighteen months later, the trial court reinstated Atkins' probation,

modified its terms to require completion of a 270-day jail term, and ordered probation to terminate upon his release from jail. Ex. 1 to Opp'n. Again, the trial court did not issue a judgment. Despite Atkins' assertion that a judgment issued on December 5, 2000, Mot. 9, Atkins has not submitted any minute order or any other documents to indicate that such an event took place prior to July 15, 2014, the time that he committed the offense charged in the Indictment. Atkins further argues that Exhibit 2 of the government's opposition brief shows that a "judgment was pronounced," ECF 37, however, Exhibit 2 is a minute order and does not show that judgment was entered. Given that Atkins had not received "a judgment imposing a punishment other than imprisonment in the state prison" for his 1998 California Vehicle Code conviction at the time of the charged offense, the predicate offense was a felony for all purposes, and it was not reduced to a misdemeanor pursuant to California Penal Code § 17(b)(1).

Atkins' cited authorities do not compel a different conclusion. While the cited authorities noted that courts can exercise their discretion to render a wobbler a misdemeanor, they also noted that a judgment imposing the lesser punishment in accordance with California Penal Code § 17(b)(1) must be entered for the offense to be deemed a misdemeanor. *E.g.*, *Gebremicael v. Cal. Comm'n on Teacher Credentialing*, 118 Cal. App. 4th 1477, 1483 (2004) (holding that "[a] crime subject to its provisions is regarded as a misdemeanor only for purposes subsequent to judgment") (citation omitted); *League of Women Voters of Cal. v. McPherson*, 145 Cal. App. 4th 1469, 1485, 52 Cal. Rptr. 3d 585, 597 (2006) (noting that "when a crime [is] punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes *after a judgment imposing a punishment other than imprisonment in the state prison*") (citation omitted) (italics and brackets in original); *People v. Smith*, 195 Cal. App. 2d 735, 738 (1961) ("It is only after a judgment imposing a punishment other than imprisonment in a state prison that this type of case is reduced from a felony to a misdemeanor"); *cf. People v. Glee*, 82 Cal. App. 4th 99, 105 (2000) (presuming the trial court treated the case as a misdemeanor because it did not retain jurisdiction over the case "with the possibility of later imposing a prison sentence" and only "granted summary probation and ordered probation to terminate upon the [defendant's] release").

Atkins proffers the alternative argument that he has successfully petitioned the state court in 2015 to reduce his 1998 California Vehicle Code conviction to a misdemeanor. ECF 18, at 4. However, this is not a valid ground for a motion to dismiss. The charged crime in the indictment occurred on or around July 15, 2014, but the conversion of the felony to a misdemeanor occurred in 2015. Indictment, ECF 1. The Ninth Circuit has held that a conversion of a felony conviction to a misdemeanor after the alleged offense had been committed does not change a defendant's status as a felon at the time of the charged offense. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (noting that "even if [the defendant's] conviction was converted to a misdemeanor after his completion of probation, [the charged] offense took place in April, 1986, four months before the end of his probation" and holding that the defendant's status as a felon was determined based "on the date he was apprehended with a firearm"); *see also United States v. Morgan*, 216 F.3d 557, 565-66 (6th Cir. 2000) (holding that "the status of the defendant on the date he possessed the firearm as alleged in the indictment that controls whether or not he has violated the statute, not his later status after his civil rights have been restored").

Lastly, the Court also does not find persuasive Atkins' contention that his state court conviction did not prohibit him from owning firearms. First, the unchecked box on the minute order does not reflect the alleged plea deal that allowed him to own firearms. Any defendant who was convicted of a felony at the time Atkins pled guilty to the predicate offense would automatically lose the right to own or possess guns until the felony is reduced to a misdemeanor. *See* Cal. Penal Code § 12021(a)(1) (1998) ("Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony"). The firearm prohibition check box on the trial court's minute order thus was irrelevant for felony cases. The purpose of the box was to impose firearm prohibitions as a condition of misdemeanor probation, where firearm prohibitions were not always automatic. *See* Cal. Penal Code § 12021(c)(1), (d)(1) (1998).[1] Thus the trial court's failure to

---

[1] *E.g.*, Cal. Penal Code § 12021(d)(1) (1998) states: Any person who, as an express condition of probation, is prohibited or restricted from owning, possessing, controlling, receiving, or purchasing a firearm and who owns, purchases, receives, or has in his or her possession or under his or her custody or control, any firearm but who is not subject to subdivision (a) or (c) is guilty

"check the box" does not change the felony status of Atkins' predicate offense. Second, even though Atkins reiterates throughout the proceeding that his state court conviction did not restrict his gun rights, Mot. 3, he has not provided any documents evidencing this lack of restriction. Because the California state law at the time of his conviction would have automatically prohibited Atkins from gun ownership, the Court does not find Atkins' argument persuasive. *See* Cal. Penal Code § 12021(a)(1) (1998).

Accordingly, Atkins was a convicted felon who was prohibited from possessing firearms when he allegedly committed the charged crimes and the motion to dismiss Count I is DENIED.

## IV. THE AGENTS DID NOT VIOLATE ATKINS' CONSTITUTIONAL RIGHTS WHEN THEY OBTAINED ATKINS' STATEMENTS AND THE FIREARMS

Atkins argues that statements he made and evidence seized by the agents on July 15, 2014, must be suppressed because the agents' interview violated Atkins' *Miranda* rights, his: "right to remain silent," right "to be free from unreasonable searches and seizures," "his right to counsel," [2] and, "the right to due process of law." Mot. 2. In support of the motion, Atkins argues that the agents continued to interrogate him, despite his having invoked his right to counsel multiple times and requested postponement of the interview. *Id.* at 4; Tr. 82:15-83:12; 84:25-85:6. Atkins further avers that the agents promised he would not be charged as long as he was honest with them. *Id.* at 95:16-20. Atkins also asserts that the agents promised not to charge him if he turned the firearms over to them. Mot. 4; Tr. 91:23-92:11. The government opposes the motion, arguing

---

of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms provided by the Department of Justice, shall notify the department of persons subject to this subdivision. The notice shall include a copy of the order of probation and a copy of any minute order or abstract reflecting the order and conditions of probation.

[2] Although Atkins makes a passing reference to his right to counsel, this is subsumed in his *Miranda* rights. Atkins' Sixth Amendment right to counsel arose only with his indictment. *Patterson v. Illinois*, 487 U.S. 285, 290 (1988). Given that the instant suppression motions pertained only to the events of July 15, 2014, before any indictment by the government, the Court need not address Atkins' right to counsel separate from his *Miranda* rights as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

that the agents did not need to *Mirandize* Atkins because he was not in custody. Opp'n 2-5. The Court addresses each of these arguments in turn.

## A. Fifth Amendment Miranda Rights

The Fifth Amendment privilege against self-incrimination requires that a person be advised of certain rights if they are "in custody" and "subjected to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467-468 (1966). The government's failure to provide such advisements renders statements made by a person during a custodial interrogation inadmissible. *See id.* Because neither party disputes that Atkins was interrogated, the Court addresses the issue of whether Atkins was in custody. *See, e.g.*, Mot. 2-6; Opp'n 2.

Whether a person is in custody requires the court to determine "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995). If, considering the totality of the circumstances, a reasonable person would not feel free to leave the interrogation, then the interrogation is considered custodial. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Generally, a reasonable person would not feel free to leave if "something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969); *see also Dyer v. Hornbeck*, 706 F.3d 1134, 1143 (9th Cir. 2013) (M. Smith, J., concurring) (explaining that circumstances and authorities' psychological pressure created a setting of custody, despite the fact that the detainee was aware of her physical ability to leave during an unescorted bathroom break, or out of an unlocked door of the interrogation room).

As an initial matter, the Court notes that "the Ninth Circuit has never decided which side bears the initial burden of proving custody or a lack of custody." *United States v. Paiz*, No. 06-00710-WHA, 2007 WL 1052891, at *3 n.2 (N.D. Cal. Apr. 5, 2007); *accord United States v. Hayes*, No. 13-00085-JD, 2014 WL 5408425, at *3 (N.D. Cal. Oct. 22, 2014). Opinions issued from the Second, Fifth, Sixth, and Eighth Circuits, as well as from numerous district courts have

1    explicitly held that a defendant bears the burden of proving he was in custody at the time

2    incriminating statements were made. *See, e.g.*, *United States v. Jorgensen*, 871 F.2d 725, 729 (8th

3    Cir. 1989); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986); *United States v. Davis*, 792

4    F.2d 1299, 1308 (5th Cir. 1986); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980);

5    *United States v. Abbas*, 418 F. Supp. 2d 280, 285 (W.D.N.Y. 2006); *United States v. Donaldson*,

6    493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006); *United States v. Morriss*, No. 06-6010, 2006 WL

7    3519344 (W.D. Mo. Dec. 6, 2006). But this Court need not resolve the issue or forecast whether

8    the Ninth Circuit would adopt the approach of these other Circuits. Because even placing the

9    burden on the government, the Court finds that the government has established that Atkins was not

10   in custody by the preponderance of evidence standard. *See, e.g.*, *Nix v. Williams*, 467 U.S. 431,

11   444 (1984) ("if the government can establish by a preponderance of the evidence that the

12   unlawfully obtained information 'ultimately or inevitably would have been discovered by lawful

13   means,' the exclusionary rule will not apply") (citation omitted); *Cox v. Del Papa*, 542 F.3d 669,

14   675 (9th Cir. 2008) ("the State need prove waiver [of Miranda rights] only by a preponderance of

15   the evidence" (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)); *United States v. Zaleski*,

16   559 F. Supp. 2d 178, 185 (D. Conn. 2008) (citing *Schneckloth*, 412 U.S. at 222) ("The prosecution

17   bears the burden of showing, by a preponderance of the evidence, that consent to search was freely

18   and voluntarily given").

19          The Ninth Circuit has set forth the following non-exhaustive list of factors that are

20   particularly relevant to the custody inquiry: "(1) the language used to summon the individual; (2)

21   the extent to which the defendant is confronted with evidence of guilt; (3) the physical

22   surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure

23   applied to detain the individual." *Kim*, 292 F.3d at 973 (quoting *United States v. Hayden,* 260

24   F.3d 1062, 1066 (9th Cir. 2001)) (internal quotation marks omitted). Other factors may also be

25   "pertinent to, and even dispositive of, the ultimate determination whether a reasonable person

26   would have believed he could freely walk away from the interrogators." *Id.* at 974. For the

27   reasons further explained below, the Court finds that here, in the totality of the circumstances,

28   Atkins was not in custody.

### i. The Language Used To Summon Defendant

The first *Kim* factor directs the Court to consider the language used to summon Atkins. Where a defendant voluntarily consents to speak with police officers, such a circumstance suggests that the interrogation was non-custodial. *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("Where we have found an interrogation non-custodial, we have emphasized that the defendant 'agreed to accompany' officers to the police station or to an interrogation room."). Here, the government presented testimony from Agent Kim that in the afternoon of July 15, 2014, Agents Kim and Awolola went to Atkins' residence. Tr. 15:7-18; 101:13-24. When Atkins answered the door, they asked him if he would speak with them. *Id.* at 103:7-9. Atkins then invited them to sit at the table in the dining and kitchen area. *Id.* at 17:17-18; 102:6-9; 104:19-21. There were no threats accompanying the agents' introduction, nor did they make any promises in order to secure Atkins' acquiescence to the interview. *Id.* at 103:21-104:3; 104:14-18. The words used by the agents to summon Atkins were inquiries, not commands. *See Kim*, 292 F.3d at 974-75 ("If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) (finding that interrogation was non-custodial where the defendant "voluntarily accompanied" officers to a police station). It was under these circumstances that Atkins agreed to answer questions. This factor weighs against a finding of custody.

### ii. The Extent to Which Defendant Was Confronted With Evidence of Guilt

Next, the Court considers the extent to which the Government confronted Defendant with evidence of guilt. The Ninth Circuit has explained that this factor weighs in favor of finding the interrogation custodial when the tone of the questioning is "aggressive, coercive, and deceptive." *Bassignani*, 575 F.3d at 884-85. In contrast, when the interview is a "consensual" conversation "conducted in an open, friendly tone," this factor weighs in favor of finding the interrogation non-custodial. *Id.* The Court finds that the latter, and not the former, best characterizes the setting here.

Agent Kim credibly testified that he and Agent Awolola went to Atkins' residence and

14

asked if they could come in and talk to him. Tr. 15:7-18; 17:17-18; 101:13-24; 103:7-9. Agent Kim also testified that he and Agent Awolola would have left if Atkins were to deny them entry into his residence. *Id.* at 18:8-25. They did not coerce Atkins with evidence of guilt, did not draw their service weapons, did not command any conduct, and agreed to sit down at Atkins' dining table. *Id.* at 103:1-104:21. The agents also did not search Atkins or his residence, and did not restrain Atkins or his family members before the questioning. *Id.* at 104:22-105:8. Rather, the agents assured Atkins that he was not under arrest and was not under custody. *Id.* at 20:2-7; 104: 13-17. Atkins himself admitted that the agents informed him that he was not under arrest and gave him opportunities to make phone calls. *Id.* at 82:6-8; 83:6-7; 86:6-11; 105:13-17. Atkins further conceded that the agents remained "professional" throughout the time they were in his residence. *Id.* at 104:17-18. Atkins also testified that about fifteen minutes into the interview, the agents showed him a copy of a letter sent to ATF, requesting a clarification from ATF whether a manufacturing license would be required for "80% build parties." *Id.* at 14:13-20; 76:1-5. Atkins denied that he ever sent that letter and said that his name on top of the letter was used without his knowledge. *Id.* at 76:1-8. As such, the agents merely asked Atkins about the letter and there was no evidence that the agents ever challenged his lack of knowledge of the letter. *See United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (concluding that the defendant was not in custody when officers "did not attempt to challenge [his] statements with other 'known facts' suggesting his guilt," and "they merely asked [him] about the allegations"). Given testimony presented at the hearing, the overall tone of the interactions was neither aggressive nor coercive but was instead a consensual conversation conducted in a cordial manner. *See Bassignani*, 575 F.3d at 884-85. This factor therefore weighs against a finding of custody.

### iii. The Physical Surroundings of the Interrogation

The third *Kim* factor instructs the Court to consider the physical surroundings of the interrogation. When an interrogation is conducted in familiar surroundings, this factor weighs against a finding that the defendant was in custody. *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989). The Court finds it significant that here, Atkins invited Agents Kim and Awolola into his own residence and that the agents agreed to interview him at his chosen location, at the

dining table.  Atkins Decl. ¶ 4; Tr. 75:10-19.  During the time the agents were inside Atkins' residence, Atkins was also free to make phone calls and to take a "smoke break."  *E.g.*, *id.* at 20:8-14; 21:3-12; 22:2-7.  The television in Atkins' residence remained on and Atkins' family were present.  *Id.* at 19:3-9.  Although Atkins disputes that he initiated the "smoke break," claiming rather that he followed the agent outside when the agent called his supervisor, Atkins was still free to move about his residence, including walking out to his front lawn to smoke.  *Id.* at 86:12-15.  As noted above, Atkins was also told that he was not under arrest and was not under custody.  *Id.* at 20:2-7.  The agents also asked for Atkins' permission, which was granted, prior to recording part of the interview, and taking photos inside Atkins' garage.  *Id.* at 28:21-29:4; 33:4-11.

These facts—an interview conducted with Atkins' consent, a self-chosen and familiar setting of his family home, the presence of only two agents, and the freedom to make phone calls and leave—strongly weigh against a finding of custody.  They stand in contrast to those other settings in which courts have found the physical surroundings of an interrogation so oppressive as to give rise to a finding of custody.  *Cf. United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (finding custody where the defendant was searched and escorted through an electronically locked door inside a government probation building, where normally the defendant's parole meetings occurred through a window in the lobby); *United States v. Carroll*, 102 F. Supp. 3d 1134, 1138 (N.D. Cal. 2015) (finding custody where the defendant was interrogated in a small room in a police station about a ten-minute drive from his motel and was reliant upon the officers for his transport home).

### iv.    The Duration of the Detention

Next, the Court considers the duration of the interrogation.  Lengthy questioning often weighs in favor of a finding that a defendant was in custody.  *See Bassignani*, 575 F.3d at 886.  While courts have not established a specific length of time that defines a custodial interview, the Ninth Circuit has held that hours-long interviews favor the conclusion that a defendant was in custody.  *See, e.g.*, *Barnes*, 713 F.3d at 1204 (finding an interrogation lasting roughly two hours indicative of custody); *Bassignani*, 575 F.3d at 886 (finding a two and a half hour long interrogation "at the high end"); *see also Carroll*, 102 F. Supp. 3d at 1139 (explaining that a two-

hour long interview "generally weighs toward a finding of custody"); *United States v. Crawford*, 372 F.3d 1048, 1052, 1059-60 (9th Cir. 2004) (concluding that the defendant was not in custody when he was interrogated for more than an hour). Here, Agent Kim testified that he and Agent Awolola arrived at Atkins' residence about 1:30 p.m. and left around 3:00 p.m., and that the interview was interrupted in the middle with a 20 to 25 minute-break. Tr. 44:13-15; 45:3-12; 53:24-54:6. In contrast, Atkins testified that the agents arrived around 1:50 p.m. or 2 p.m. and left around 3:10 p.m. *Id.* at 101:13-102:17; 115:15-116:4. Under either version of the events, the agents were in his house for at most one and a half hours, and assuming that a 25-minute break was taken, the interview was about an hour. Atkins Decl. ¶ 14. Under relevant case law in this Circuit, the Court finds this factor to be neutral or to weigh only slightly in favor of custody.

### v. The Degree of Pressure Applied to Detain Defendant

Finally, *Kim* directs the Court to consider the degree of pressure used to detain Atkins. By itself, the absence of physical restraints is not dispositive. *Barnes*, 713 F.3d at 1203. Instead, the inquiry considers the extent that officers subjected a defendant to both physical and psychological force in the course of the interview. *Dyer*, 706 F.3d at 1143-44 (M. Smith, J., concurring). In this case, neither Atkins nor anyone else in his residence was ever handcuffed or otherwise physically restrained at any point while interacting with the agents. Tr. 105:6-15. Atkins contends he was not free to leave because he did not want to leave his family behind. *Id.* at 113:17-114:6. However, Atkins does not dispute that the room in which the interview took place was never locked, and that Atkins and his family were not restricted from leaving. *E.g.*, *Bassignani*, 575 F.3d at 886 ("We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time."); *Norris*, 428 F.3d at 912 (determining that the defendant was not in custody in part because he was told that "he was not under arrest and he was never restrained in any way"); *Crawford*, 372 F.3d at 1060 (concluding that because the defendant was told that he "was not under arrest and was free to leave" he was "aware of the freedom to depart" and his questioning was noncustodial).

Atkins testified to a number of facts in an attempt to support his argument that he experienced pressure during the interview. He testified that he asked that the interview be

postponed at least twice and informed the agents that he did not want to talk until he contacted his attorney but the agents continued to interview him. Atkins Decl. ¶¶ 5, 8; Tr. 84:25-85:18; 113:24-114:6. According to Atkins, the agents also represented that they would not leave until they ensured that there were no firearms in the residence, and that they would have obtained a warrant to come back if Atkins did not consent to their presence. *Id.* at 85:15-86:2; 95:9-15. Atkins also testified that the agents promised he would not be charged as long as he did not lie, and told him that he did not need an attorney. Atkins Decl. ¶¶ 7, 10; Tr. 83:2-12; 85:21-86:2; 89:12-20. Atkins then testified that he gave up the firearms only so the agents would leave his house. *Id.* at 91:12-92:11; 95:16-19. Atkins also argues that he could not leave because the agents were in his home. *Id.* at 113:17-114:6; Notes 1, ECF 37. However, Agent Kim's testimony contradicts Atkins' version of events. According to Agent Kim, Agent Kim did not insist on ensuring that there were no firearms in the house as a condition for leaving the house and did not promise that there would be no charges if Atkins was honest. Tr. 27:18-22; 28:8-14; 117:24-118:10. Agent Kim explained that he had no authority to make deals with Atkins. *Id.* at 27:23-25; 28:18-14. Agent Kim further testified that Atkins never represented that he did not want to talk, and that he kept answering questions when he was not making phone calls. *Id.* at 58:16-59:2; 108:18-21. Agent Kim also said that he did not represent to Atkins that he would come back with a warrant. *Id.* at 118:11-16.

Although Atkins' testimony suggests that there might have been some pressure, it is significant that Atkins kept on answering the agents' questions and never insisted that the agents leave the house. Atkins also did not dispute that the agents unequivocally told him that he was not under arrest. While Atkins claims that he could not leave because the agents were in his home with his family present and that the agents outnumbered him, Notes 1, ECF 37, the Supreme Court and the Ninth Circuit have made clear that in determining the presence of a custodial setting for purposes of *Miranda*, "the 'subjective views harbored by . . . the person being questioned' are irrelevant." *J.D.B. v. N. Carolina*, 564 U.S. 261, 271 (2011) (citing *Stansbury*, 511 U.S. at 323); *Smith v. Clark*, 804 F.3d 983, 992 (9th Cir. 2015) ("The custody determination is objective and is not based upon 'the subjective views of the officers or the individual being questioned.'" (quoting *Bassignani*, 575 F.3d at 883)). "The test [for custody], in other words, involves no consideration

18

of the 'actual mindset' of the particular suspect subjected to police questioning." *J.D.B.*, 564 U.S. at 271 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004); *California v. Beheler*, 463 U.S. 1121, 1125, n.3 (1983) (per curiam)).  Atkins' subjective feeling that he was unable to leave the interview has no bearing on whether he was in custody for purposes of *Miranda*.

At times, an officer's statement that a suspect is not under arrest means little if, given other circumstances, no reasonable person in the suspect's setting would have felt free to leave.  This is particularly true when at the end of such an interaction with police officers the suspect is arrested on site.  In those cases, the suspect may have already been "in custody" for purposes of *Miranda* long before the actual arrest was made.  The on-site arrest raises the spectre of custodial interrogation notwithstanding the officer's rote pronouncements to the contrary, and courts are wary to scrutinize such circumstances to ensure that the suspect's Fifth Amendment protections were not violated.  Here, however, no such circumstances were present.  At no time during the interview did the agents arrest or restrain Atkins in any way.  The agents also asked Atkins' permission before they started recording part of the interview and before they took photos from inside his garage.  Atkins Decl. ¶ 4.  Atkins himself also testified that he voluntarily relinquished his firearms and helped agents carry the ammunition to their car.  Tr. 26:23-24; 27:14-17; 92:3-24; *see Bassignani*, 575 F.3d at 886 (citing *United States v. Leese*, 176 F.3d 740, 744 (3d Cir. 1999) (finding no custody when, among other things, the defendant "was specifically informed that when the questioning was concluded the inspectors would be returning to Harrisburg and she would not be going with them")).

These circumstances, as well as the credibility of Agent Kim's testimony support that the degree of pressure do not rise to the level where a reasonable person would not have felt free to leave the interrogation.  Accordingly, the Court finds this factor is at best neutral.

### vi.     The Totality of the Circumstances

All told, the Court concludes that the first, second, and third *Kim* factors together weigh heavily against finding that Atkins was in custody.  The fourth factor, the duration of the interview is neutral or weighs slightly in favor of a finding of custodial interrogation.  Lastly, the fifth factor, the degree of pressure, is neutral.  As the custodial analysis requires the Court to consider all the

circumstances in its entirety, however, no one factor is alone dispositive of the issue. In addition, in some contexts, some factors may be accorded greater weight, and others less.

As to the durational prong of the *Kim* analysis specifically, the Ninth Circuit has explained that where the interview "[is] not a 'marathon session designed to force a confession,'" courts "accord less weight to this factor." *Bassignani*, 575 F.3d at 886 (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171(4th Cir. 1985)). Indeed, the appellate court has on several occasions held that a suspect was not subjected to custodial interrogation where, notwithstanding the extended duration of the interview, other factors weighed heavily against custody. In *Bassignani*, the Ninth Circuit held that a defendant whose interrogation took place in familiar surroundings, and who was not pressured by officers to confess, was not in custody for purposes of *Miranda*, even though the interrogation took place over two and a half hours. *Id.* at 884-87. Similarly in *United States v. Manning*, the Ninth Circuit affirmed the district court's conclusion that the defendant was not in custody despite questioning that lasted for "over four hours," because she was free to leave, and the agents did not threaten, restrain, or subject the defendant to any physical or psychological pressure during the interview. 312 F. App'x 34, 35 (9th Cir. 2009).

Other factors may in some circumstances be given more weight. In *Dyer*, the Ninth Circuit affirmed the district court's conclusion that the defendant there was not in custody, finding it significant that she had agreed to accompany officers to a police station and was told that she was not under arrest and was free to leave. 706 F.3d at 1139 (citing *Oregon v. Mathiason*, 429 U.S. 492 (1977)). The court discussed a prior opinion that was relied on in *Mathiason*, noting that there, "the '[d]efendant agreed to go to the FBI office,' and we explicitly labeled as 'most significant for resolving the question of custody' the fact that the '[d]efendant was expressly told that he was not under arrest.'" *Id.* at 1139 (citing *Crawford*, 372 F.3d at 1059-60). These factors weighed heavily against finding custody for purposes of *Miranda*.

So too does the Court ultimately find against custodial interrogation here. Only one of the *Kim* factors slightly points to a finding of custody, but the many other facts presented in this case clearly tip the scale in favor of a finding of non-custody. Agents Kim and Awolola asked, not commanded, Atkins to speak with them and Atkins invited them into his home. Atkins then

directed the agents to the dining table, a location of his choice, and the interview occurred in the presence of Atkins' family and a television that was playing. The agents remained at all times cordial and respectful. They presented to Atkins a copy of a letter they have received requesting a clarification from the ATF, but did not engage in strong-arm tactics that accused Atkins of guilt. When Atkins wanted breaks or opportunities to make phone calls, the agents complied with each one. The agents also assured him that he was not under arrest. At the end of the interview, the agents left. Examined in its totality, the facts here do not indicate that Atkins was in custody.

### vii. Reliance on *Craighead* and *McKany*

In support of his argument that his statements should be suppressed as the product of un-*Mirandized* custodial interrogation, Atkins relies on *United States v. Craighead* and *United States v. McKany*. 539 F.3d 1073, 1082 (9th Cir. 2008); 649 F. App'x 553, 554-55 (9th Cir. 2016). However, neither case is analogous to this case, as both *Craighead* and *McKany* concerned facts where the defendant was significantly deprived of his freedom of action, which are not present here.

In *Craighead*, the Ninth Circuit held that the "benchmark for custodial interrogations in locations outside of the police station" is whether or not the interrogation occurred in a "police-dominated atmosphere." 539 F.3d at 1083. In determining whether the defendant was under custody based on an in-home interrogation, the court analyzed the following factors: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Id.* at 1084. The court noted that "eight law enforcement officers, representing three different law enforcement agencies, entered [the defendant's] home . . . and some of them unholstered their firearms in [the defendant's] presence." *Id.* at 1085. The defendant was "escorted to a back storage room and the door was closed behind him," with an officer leaning toward the door to block his exit from the room. *Id.* at 1086. The defendant was also isolated from others. *Id.* at 1087. Given these circumstances, the Ninth Circuit found that the defendant was under custody and that an officer's

recitation that the defendant was free to terminate the interview did not render the interrogation non-custodial. *Id.* at 1087-88.

Similar to *Craighead*, but vastly different from the present case, the defendant in *McKany* also experienced a "police-dominated atmosphere." 649 F. App'x at 554-55. The officers in *McKany* "swarmed into [the defendant's] home at 6:30 a.m. in full tactical gear and with guns drawn." *Id.* at 554. "[E]ight to ten officers initially entered the house, and fourteen officers were ultimately involved in executing the search warrant." *Id.* at 555. The defendant was then handcuffed prior to the interrogation, and escorted to a bedroom with the door closed, isolated from others. *Id.*

The facts in *Craighead* and *McKany* hardly resemble those here. There was no evidence that the agents brandished their weapons, used their weapons against Atkins, or isolated Atkins in any way similar to what the defendants in *Craighead* and *McKany* experienced. Even though there were two agents in his residence, Atkins admitted that they were professional and courteous. Atkins also was not isolated as he was free to make phone calls, free to move about his house, and his wife and child were present. Accordingly, there was no evidence suggesting that Atkins experienced a "police-dominated atmosphere," as in *Craighead* and *McKany*.

For the reasons discussed above, the Court thus concludes that Atkins was not in custody at that time and that no Fifth Amendment rights were violated.

## B. Fourth Amendment Right to be Free from Unreasonable Searches and Seizures

Atkins' brief also makes a passing mention to his right "to be free from unreasonable searches and seizures" as a basis in support of the motion to suppress the firearms seized by the agents. Mot. 2. The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963)). However, it is well settled that "a search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether

consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.* It is the government's burden to prove that the consent was freely and voluntarily given by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Factors to be considered in determining whether consent to search or seizure was voluntary are: "(1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the person was told that a search warrant could be obtained." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). "No one factor is determinative in the equation." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (citation omitted). "It is not necessary to check off all five factors, but "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors." *Id.* (citation omitted).

The first three factors weigh strongly in favor of finding consent and are undisputed. First, the Court has already determined that Atkins was not in custody based on the reasoning set for the above. Second, there was no evidence that the agents drew their weapons at any time when they were interviewing Atkins. Third, even though the agents did not administer *Miranda* warnings, the warnings were not necessary as Atkins was not in custody.

Turning to the fourth factor, whether "the officer informed the person of his right to refuse to consent," the Court finds this factor to weigh slightly against finding of consent at best, as there is no evidence of coercion. Atkins was informed that he was not in custody and not under arrest. While there was no testimony stating that the agents explicitly informed Atkins of his right to refuse to consent, there was also no evidence that Atkins was threatened into relinquishing his firearms. During the interview, Atkins voluntarily informed the agents that he owned firearms. Tr. 25:8-13; 62:13-17. However, Atkins denied claiming ownership of any handguns during the interview. *Id.* at 86:12-25. According to the ATF database, his wife owned a handgun, but his wife did not know where it was. Ex. 1 to Opp'n ¶ 6; Tr. 65:3-13. Atkins also refused to divulge the address of his second residence. Ex. 1 to Opp'n ¶ 6. When the agents told Atkins that he could not own firearms because of his criminal history, Atkins suggested that he would turn them

23

over to his uncle. Tr. 26:6-18. The agents then stated that Atkins should provide the contact information of his uncle so they can ensure the uncle's right to own firearm. *Id.* at 26:20-27:5. Instead of providing his uncle's contact information, Atkins chose to sign a form relinquishing his firearms and handed them to the agents. *Id.* at 27:6-17. Atkins himself also testified that he voluntarily relinquished his firearms and helped agents carry the ammunition to their car. Tr. 26:23-24; 27:14-17; 92:3-24. These facts are not disputed by Atkins, except that that Atkins testified that he gave up the firearms so that the agents would leave. *Id.* at 91:12-92:11; 95:16-19. Atkins' choice to divulge certain pieces of information but not others throughout the course of the interview demonstrates that he felt free to answer certain questions but not others. Based on this and other circumstances surrounding the interview, the Court does not find that Atkins' relinquishment of firearms to be a product of coercion or threat and that this factor of whether "the officer informed the person of his right to refuse to consent" leans only slightly against a finding of consent.

Lastly, as to whether Atkins "was told that a search warrant could be obtained," Agent Kim and Atkins provided contradicting testimony on this point. However, the Court finds the testimony of Agent Kim to be more credible. According to the evidence presented, Atkins selectively provided certain information to the agents but not others. While it was within his right to do so or to completely terminate the interview, the Court finds Agent Kim's testimony to be more consistent and thus more credible.

Considering all the factors discussed above, the Court finds that the totality of the factors weigh in favor of finding consent. Accordingly, the motion to suppress any evidence seized at Atkins' residence, such as the firearm and ammunition relinquished by Atkins, is DENIED.

**V.    ORDER**

For the foregoing reasons, the Court finds that Atkins was a convicted felon prohibited from owning firearms at the time the charged crime was allegedly committed.

The Court further concludes that Atkins was not subjected to custodial interrogation in violation of his Fifth Amendment rights at his residence on July 15, 2014. The Court also

24

concludes that the agents obtained the tangible evidence from Atkins' residence on July 15, 2014 by Atkins' consent. Defendant's motion to dismiss and motion to suppress are therefore DENIED.

**IT IS SO ORDERED.**

Dated: June 19, 2017

_____
BETH LABSON FREEMAN
United States District Judge